IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| BRANDE L. MOODY, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | 5:04-CV-364 (DF) |
| | : | |
| COLISEUM PSYCHIATRIC | : | |
| CENTER, LLC and HCA, INC., | : | |
| | : | |
| **Defendants.** | : | |

_____

## O R D E R

Plaintiff Brande L. Moody has sued Defendants Coliseum Psychiatric Center,

LLC, and HCA, Inc., under Title VII of the Civil Rights Act of 1964 (Title VII),

42 U.S.C.A. § 2000e *et seq.*, alleging that defendants discriminated against her on

the basis of her sex by (1) fostering a hostile working environment and then (2)

terminating her employment in retaliation for her having complained about the

discrimination in a manner protected by 42 U.S.C.A. § 2000e-3(a).  At Moody's

request, Defendant HCA, Inc., was dismissed from the lawsuit on November 8, 2005.[1]

Defendant Coliseum Psychiatric Center, LLC, has moved for summary judgment on

both claims.  Moody has moved to exclude certain pieces of testimonial and

_____

[1] HCA, Inc., moved for summary judgment before it was dismissed (doc. 25); that motion
is now moot.

documentary evidence submitted by Coliseum in support of its summary-judgment motion.

For the reasons explained below, Moody's motion to exclude (doc. 29) is denied, and Coliseum's motion for summary judgment (doc. 24) is granted.

## I. BACKGROUND

Plaintiff Brande L. Moody, a 32-year-old white female, is a licensed practical nurse (LPN). She was hired in 1998 to work in a division of Medical Outsourcing, Inc., known as Med-Source, an agency that provides staffing services to medical-care facilities. Med-Source assigned Moody to perform work as an LPN on an as-needed basis at various hospitals and nursing homes throughout middle Georgia, including Defendant Coliseum Psychiatric Center, LLC, (Coliseum) located in Macon.

During the period of time relevant to this lawsuit, Coliseum's use of Med-Source personnel (LPNs, RNs, etc.) was governed by a contract between Med-Source and a medical-staffing agency called All About Staffing, Inc. (AAS), a company that specifically serves the staffing needs of HCA, Inc.-affiliated hospitals and surgical centers (of which Coliseum is one). The contract specified that Med-Source personnel provided to AAS were to be compensated for their services by Med-Source, not AAS or any HCA, Inc.-related facility to which they were assigned. The contract denominated Med-Source as AAS's independent contractor and stated that all Med-

-2-

Source personnel were to be considered employees of Med-Source only. Under the contract, Med-Source retained the sole responsibility for withholding its employees' federal and state income taxes, paying their federal social security taxes, and maintaining unemployment insurance and worker's compensation.

Moody was sporadically assigned to Coliseum through another staffing agency beginning in 1998, but Med-Source did not begin to assign her there regularly until January 2002.[2]  It was not until April 2003 that Moody first came into contact with Bill Winget, an agency nurse and the alleged harrasser at the center of this lawsuit. The two crossed paths while working the same shift at Coliseum.  During their first few interactions, Moody experienced no problems with Winget.  But by their second week working together, Winget "got into some dirty jokes," and while he did not direct any objectionable comments toward Moody, he "was very sexual in nature to some of the females that we encountered."  (Moody Dep., doc. 35, at 57:18, 21-22). For example, on one occasion as Moody showed Winget where Coliseum's pharmacy was located, the two encountered a female pharmacist who was holding an armload of medicine in front of herself with her arms resting across her chest.  Winget, without saying the word breasts or any other of its anatomical synonyms, made what

---

[2] Moody's early assignments to Coliseum were made primarily by a staffing agency called MAPSS, Inc., which is no longer in business.  From September 2002 through June 2003, the time period relevant to this lawsuit, Moody was assigned to work at Coliseum primarily by Med-Source.

Moody characterizes as a "more than innocent [ ] comment" (a characterization the Court finds ambiguous) in reference to the way the pharmacist was standing. (*Id*. at 59:11).

Later the same week, Winget made a comment to Moody "about the way [a] social worker's pants hugged her butt." (*Id*. at 60:21-22). Moody ignored the comment and walked away. She did not report that comment or the one in reference to the pharmacist's posture to any Coliseum employee. During the same shift in which Winget made the comment regarding the social worker's pants, Winget told Moody that one of the hospital's large-breasted patients, who had come to the hospital to pick up her medication and happened to lean over the counter in Winget's direction, had just given him "a really nice view." (*Id*. at 64:12). Moody told him that he should stop making remarks like that.

On a subsequent encounter with Winget, sometime in June 2003, Moody found herself alone in an elevator with him as the two prepared to begin their shifts at the hospital. Having just had her hair and makeup done, Moody went to work that day "dressed a little more than usual," which prompted Winget to ask her whether she "was going to get some that night." (*Id*. at 67:5). When Moody responded that she did not know, Winget said, "[W]ell, if I was your husband you would." (*Id*. at 67:8). Moody exited the elevator without responding to him.

Later that day, Moody reported the elevator incident to Jean Antonich, a charge nurse at Coliseum who was responsible for making shift assignments, and asked if she could be placed on a different unit than Winget because his proclivity for uttering sexual remarks made her uncomfortable. (*Id*. at 68:13-18; 69:1-3). Antonich, who was not a supervisor, said she would keep her eye on Winget, but told Moody that the hospital needed her services in the adult unit, the same unit to which Winget was assigned.

The following week, Moody again found herself alone in an elevator with Winget as she arrived for her shift. Winget told Moody that "he would like to take [her] to bed because [she] was looking pretty hot." (*Id*. at 71:13-14). Moody told Winget that she did not appreciate his comment and that his joking had "gone too far." (*Id*. at 71:22). Later that same day, Moody was in a room where some of the hospital's medications were kept (something akin to a small storage closet) when Winget entered the room to wash his hands and, while doing so, brushed the back of his hand against Moody's rear end. (*Id*. at 72:17; 73:24). Moody interpreted the contact as intentional because in her view Winget did not have a legitimate reason to be in the medication room. (*Id*. at 73:9-10).

Shortly before these final two occurrences, Moody reported her discomfort with Winget to Amy Moore, a night-shift supervisor at Coliseum, who said that she

would report Moody's complaints to Doug Webster, Coliseum's administrator. (*Id.* at 79:15-16; 79:25-80:1-3). Moody did not document this complaint in writing. (*Id.* at 80:22). Just before the second elevator incident, when Winget told Moody he would like to take her to bed, Moody told Sheila Banks, an acting supervisor at the hospital, that she was "having problems" with Winget. (*Id.* at 84:19-20). After the second elevator incident, Moody again reported Winget's behavior to Moore, who again assured her that she would pass along Moody's concerns to Webster. (*Id.* at 82:15-16).

The second elevator incident was the final interaction between Moody and Winget. It occurred on a Thursday in late June. The following Monday morning Moody contacted Monica Pope, a Med-Source representative, to complain about Winget's behavior because, according to Moody, no one at Coliseum would "acknowledge" her previous complaints. (*Id.* at 89:20). Moody was upset because no one from Coliseum's administration would come to talk with her about the situation. (*Id.* at 90:3-4). Moody spoke to Pope about her encounters with Winget while she was at the Med-Source office picking up her paycheck. (*Id.* 91:18-19). Pope alerted AAS, and at AAS's request, Moody prepared a written complaint, which Pope then faxed to AAS. Late in the day on Monday, Moody received a telephone call from Pope informing her that Coliseum had placed her on its "do not use"

list—that is, that Coliseum no longer wanted Med-Source to assign Moody to the facility.

Pope informed Moody that her placement on the "do not use" list was prompted, at least in part, by her failure to show up for work the previous weekend and her "refus[al] to change job duties." (*Id*. at 96:15-16). Pope told Moody that she could contact Deborah Bell or Cindy Pyle, both representative of AAS, if she wanted to know more about why she was placed on the list. (*Id*. 97:5, 10, 15-16). Over the next several days, Moody attempted to contact Bell and Pyle two times each, without success. She ultimately reached Faye Pereski, presumably an AAS employee, who Moody states was "under Cindy Pyle." (*Id*. at 98:11). Pereski did not know that Moody had been placed on the "do not use" list and told Moody that she had been "one of the best" Med-Source nurses. (*Id*. at 98:24).

Med-Source never again assigned Moody to work at Coliseum, though Moody continued her employment with Med-Source as an agency nurse and continued to receive assignments to other medical facilities following her placement on Coliseum's "do not use" list. (*Id*. at 99:19). For a period of roughly six months, Moody went from working 36 hours a week at Coliseum to approximately 20 hours a week at various other locations, before resuming a full-time schedule at a medical facility in Dublin, Georgia.

Moody believed that her working conditions at Coliseum were sexually hostile due to Winget's behavior and that Coliseum unlawfully retaliated against her by placing her on the "do not use" list after she raised complaints about him. After filing a discrimination charge with the EEOC and receiving her right-to-sue letter, Moody filed this lawsuit on October 27, 2004.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also **Celotex Corp. v. Catrett***, 477 U.S. 317, 322 (1986).  A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986).  The Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but may not make credibility determinations or weigh the evidence.  ***Id.*** at 249.  Finally, "the evidence presented cannot consist of conclusory allegations or legal conclusions."  ***Avirgan v. Hull***, 932 F.2d 1572, 1577 (11th Cir. 1991).

-8-

## II.  PARTIES' CONTENTIONS

Coliseum argues that it is entitled to summary judgment for three reasons: (1) Moody was not an "employee" of Coliseum for purposes of Title VII; (2) Moody has failed to demonstrate the prima facie elements of a Title VII hostile-environment claim; and (3) Moody has failed to demonstrate the prima facie elements of a Title VII retaliation claim.

Moody, on the other hand, argues that she was an "employee" of Coliseum and that she has created genuine issues of material fact on both her hostile-environment and retaliation claims under Title VII.

Before the Court addresses Coliseum's motion for summary judgment, it will address Moody's motion to exclude[3] certain testimonial and documentary evidence (two declarations and an attached written contract) submitted by Coliseum.

---

[3] Moody's motion is styled a "Motion to Strike," and Coliseum, in response, argues that it should be denied outright because Federal Rule of Civil Procedure 12(f), which governs motions to strike, deals only with "pleadings"—which declarations and affidavits are not.  The Court rejects Coliseum's argument in this respect because nowhere in her motion does it indicate that Moody has moved under Rule 12(f) and because the caption of her motion is not controlling in any event. Instead, Moody has lodged various evidentiary objections to the material relied upon by Coliseum in support of its summary-judgment motion.  The Court thus construes Moody's motion as a motion in limine, as it was filed at the pre-trial stage of these proceedings, and will refer to it as a "motion to exclude."

# III.  DISCUSSION

**A.    Moody's Motion to Exclude Evidence**

**1.      Declarations Made Under 28 U.S.C.A. § 1746**

In connection with its motion for summary judgment, Coliseum submitted to the Court the declarations of two witnesses:  Deborah Bell (an AAS representative) and Patrick Luttrell (a Coliseum representative).  *See* Exs. B&C to Def.'s Mot. Summ. J., doc. 24.  Both declarations are unsworn, but were filed pursuant to a statute that permits a party to support a summary-judgment motion with an unsworn declaration so long as the declarant states that his testimony is "true under penalty of perjury." 28 U.S.C.A. § 1746 (requiring unsworn declarations to substantially comply with this form: "I declare . . . under penalty of perjury that the foregoing is true and correct."). Moody objects to these declarations on the grounds that they do not conform with the requirements of 28 U.S.C.A. § 1746.

Bell's and Luttrell's declarations, as originally submitted to the Court, did not contain language stating that the testimony therein was given under penalty of perjury.  The declarations were therefore technically noncompliant with the statute, and on that basis Moody asked that the Court refrain from considering them.  In response to Moody's motion, however, Coliseum cured the technical deficiencies by redrafting the declarations, adding the "under penalty of perjury" language, and

-10-

resubmitting them to the Court.  Because Bell's and Luttrell's declarations now comply with the requirements of 28 U.S.C.A. § 1746, the Court will not exclude them based on their original deficiencies.

### 2.     The Med-Source/AAS Contract

Attached to Bell's declaration is a copy of the contract between Med-Source and AAS.  *See* Att. 1 to Ex. B to Def.'s Response to Pl.'s Mot. Strike, doc. 33. Moody argues that the contract should be excluded as inadmissible evidence because (1) it has not been properly authenticated under Federal Rule of Evidence 901, and (2) it constitutes hearsay under Federal Rule of Evidence 801, which is inadmissible under Rule 802 because it does not fall within any hearsay exception outlined in Rules 803 or 804.  These arguments are unavailing.

#### a.     *Authentication or Identification Under Rule 901*

In deciding a motion for summary judgment, the Court is free to consider only admissible evidence.  "[A]s a condition precedent to [its] admissibility," documentary evidence must be authenticated or identified, and that condition "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a) (West 2005).  Moody does not contend that the document attached to Bell's declaration is not actually the contract between Med-Source and AAS.  Nor does she argue that her employment with AAS was not

governed by that contract or that there are any irregularities regarding the source or content of the contract.  Instead, she says only that it is "not properly authenticated." The Court disagrees.

The declaration to which the contract is attached was given by Deborah Bell, an agent of AAS (a party to the contract) who purports to have personal knowledge of the function and role of her company, the contractual relationship between her company and Med-Source, and the relationship between her company and Coliseum. *See* Ex. B. to Def.'s Response to Pl.'s Mot. Strike, doc. 33.  Bell stated that AAS receives medical-staffing services from Med-Source pursuant to a written contract, that Moody was an employee of Med-Source, and that "a true and correct copy of the contract" is attached to her declaration as Exhibit 1.  Taken together, these statements, all of which are based on information within Bell's personal knowledge, are "sufficient to support a finding that the matter in question is what the proponent claims"—that is, that the document attached to the declaration is the contract between AAS and Med-Source pursuant to which Moody was assigned to Coliseum.  *See* Fed. R. Evid. 901(a); *see also* Fed. R. Evid. 901(b)(1) (authentication or identification sufficient where there is "testimony of a witness with knowledge. . . that a matter is what it is claimed to be.").  Rule 901 does not require more.

### b.    *Hearsay Under Rule 801*

Moody also objects to the introduction of the Med-Source/AAS contract on the grounds that it constitutes inadmissible hearsay.  She does not cite any authority for that blanket proposition, and the Court has found none to support it.  Moody has not laid a foundation for her hearsay objection.  She has not argued that the contract is in any way "assertive" or that, even if it could be construed as an intended assertion, it has been offered in evidence to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(a) advisory committee note ("The effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion.").  Confronted with an argument similar to Moody's, the United States Court of Appeals for the Eighth Circuit stated:

> The hearsay rule excludes out-of-court assertions used to prove the truth of the matter asserted in them.  Verbal acts, however, are not hearsay because they are not assertions and not adduced to prove the truth of the matter.  The Federal Rules of Evidence 'exclude from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the legal rights of the parties or is a circumstance bearing on the conduct affecting their rights.'  Fed. R. Evid. 801(c) advisory committee note.  *A contract, for example, is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay.*

***Mueller v. Abdnor***, 972 F.2d 931, 937 (8th Cir. 1992) (emphasis added; some citations omitted).  The contract between Med-Source and AAS is a verbal act that

affects the legal rights of Moody vis-à-vis Med-Source, AAS, and Coliseum.  It is thus not hearsay and is not inadmissible on that basis.

Because the declarations are in compliance with 28 U.S.C.A. § 1746, and because the contract attached to Bell's declaration has been adequately authenticated and is not hearsay, Moody's motion to exclude is denied.[4]

**B.      Coliseum's Motion for Summary Judgment**

**1.      Was Moody Coliseum's Employee for Purposes of Title VII?**

Title VII forbids an employer from discriminating against its employees on the basis of certain of the employees' personal characteristics.  42 U.S.C.A. § 2000e–2 (race, color, religion, sex, or national origin).  Title VII—which applies to employees but not independent contractors—circularly and unhelpfully defines "employee" as "an individual employed by an employer." 42 U.S.C.A. § 2000e(f).  An "employer," in turn, is more usefully defined as "a person engaged in an industry affecting commerce who has fifteen or more employees" for a specified period of time.  42 U.S.C.A. § 2000e(b).  For obvious reasons, Coliseum does not dispute that it is engaged in an industry affecting commerce and does not raise a challenge to the

---

[4] Moody raises a number of other specific evidentiary objections to some of the statements in Bell's and Luttrell's declarations, but the Court finds it unnecessary to address these objections because the adjudication of Moody's motion for summary judgment does not depend on any of the objected-to statements.

employee-numerosity requirement.  *See Arbaugh v. Y&H Corp.*, 126 S.Ct. 1235, 1238-39 (2006) (employee-numerosity requirement is not jurisdictional).  Coliseum instead argues that Moody was not its employee for purposes of Title VII, maintaining that she was at all times an independent contractor and thus not protected by the statute.[5]  *See Wilde v. County of Kandiyohi*, 15 F.3d 103, 104 (8th Cir. 1994) ("Title VII protects workers who are 'employees,' but does not protect independent contractors.") (citing *Spirides v. Reinhardt*, 613 F.2d 826, 829-30 (D.C. Cir. 1979)).

To determine whether an individual is an employee or an independent contractor for purposes of Title VII, the Eleventh Circuit (and virtually every other

---

[5] Coliseum argues that it was not Moody's employer.  *See* Def.'s Br. Supp. Mot. Summ. J., doc. 24, at 2.  Having examined the substance of its argument, however, the Court would categorize it somewhat differently.  Because Coliseum has not argued that it is not an "employer" within the meaning of that statutory term—that is, Coliseum does not take issue with the affecting-commerce or employee-numerosity requirements—the Court construes Coliseum's argument as one essentially attacking Moody's status as its "employee."  These are related but distinct inquiries.  The Court's treatment of Coliseum's argument as one going to Moody's status as an "employee" is consistent with Coliseum's principal reliance on *Zinn v. McKune*, 143 F.3d 1353 (10th Cir. 1998), a case in which the Tenth Circuit, facing facts remarkably similar to those presented here, determined that "the sole issue presented is whether [plaintiff] is an employee of the [defendant]."  143 F.3d at 1357.

To support its argument that it was not Moody's employer, Coliseum, in its summary-judgment brief, cites and relies upon *Lyes v. City of Riviera Beach*, 166 F.3d 1332 (11th Cir. 1999) (en banc), a case in which the Eleventh Circuit set forth the three different tests utilized to determine when multiple employers may be properly aggregated so as to satisfy Title VII's employee-numerosity requirement.  166 F.3d at 1341 ("We must therefore decide what test applies in determining whether separate . . . entities should be counted as a single 'employer' for purposes of meeting the statutory definition under Title VII.").  The employee-numerosity requirement is not at issue in this case, however, and for that reason *Lyes* and the three tests it discusses—the "single employer" test, the "joint employer" test, and the "agency" test—are inapposite (though the tests may share some characteristics of the hybrid "economic realities" test, which, as stated in the text, the Court finds controlling).  166 F.3d at 1341.

federal circuit) applies the hybrid "economic realities" test—a test that takes into account both the economic realities of the employment relationship and traditional common-law agency principles, including the employer's "right to control and direct the work of an individual, not only as to the results to be achieved, but also as to the details by which that result is achieved." **Cobb v. Sun Papers, Inc.**, 673 F.2d 337, 340 (11th Cir. 1982); *see also* **Cuddeback v. Fla. Bd. Educ.**, 381 F.3d 1230, 1234 (11th Cir. 2004); **Wilde**, 15 F.3d at 105 (collecting cases from other circuits).

"Consideration of all the circumstances surrounding the work relationship is essential, and no one factor is determinative.  Nevertheless, the extent of the employer's right to control the 'means and manner' of the worker's performance is the most important factor." **Cobb**, 673 F.2d at 340.  Other factors relevant to the right-to-control inquiry may include:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship was terminated; i.e. by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer;' (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties.

-16-

*Id.* The extent to which these factors are relevant will vary from case to case.

With respect to some of the ***Cobb*** factors, the evidence before the Court is sparse or nonexistent.  But applying these factors to the evidence that has been presented, the Court concludes that Moody performed nursing services at Coliseum as an independent contractor, not as Coliseum's employee.

         *1.*     *Was Moody's work performed under a supervisor's direction?*

There is no evidence that the details of Moody's work were directly supervised, monitored, or controlled by anyone at Coliseum.  Moody testified in her deposition that at the beginning of each of her shifts at Coliseum she would report generally to the floor where she was assigned to work, but that she was not required to check in with a supervisor.  She stated that supervisors were present in the hospital, but her testimony indicates that her interaction with them was incidental and limited.  For instance, Moody stated that at various times during the day, as Coliseum supervisors made their rounds throughout the hospital, they would happen to see whether the agency nurses were present for their shifts. (Moody Dep., doc. 35, at 29:7-10).  Apart from those nominal interactions, however, Moody has not produced any evidence to indicate that the particulars of her day-to-day duties at the hospital were overseen by anyone in a supervisory capacity.

### 2. What skill is required of Moody's occupation?

Moody has a specialized, college-level degree in practical nursing and is licensed by the State of Georgia to work as an LPN.  This fact is not particularly helpful, however.  One might reasonably conclude that the skills required by Moody's job are significantly more advanced than those of a lesser-trained, lesser-educated hourly wage earner and, hence, more indicative of an independent contractor than an employee.  But there are equally well-trained, highly skilled LPNs and other medical personnel who are formally and directly employed by hospitals and medical-care facilities (i.e., on the facilities' payrolls), and those employees are not transformed into independent contractors simply by virtue of their sophisticated training.  This factor does not weigh in favor of one side over the other.

### 3. Who provided the equipment and space necessary for Moody's work?

Coliseum clearly provided the facility in which Moody worked, and, although there has been no evidence produced on this point, the Court has no reason to think that Coliseum requires its agency nurses to supply the key equipment necessary for the performance of their nursing-related tasks while on call at the hospital.  That would seem a silly proposition.

### 4.    How long did Moody perform work at Coliseum?

Moody accepted regular placements at Coliseum for a period of roughly 18 months, generally working three 12-hour shifts per week from January 2002 until June 2003 when Coliseum asked Med-Source to stop assigning her to work in its facility.  The fact that a worker is assigned to work at a particular location over an extended period of time may at first blush seem to be indicative of the worker's status as an employee; however, given the other factors surrounding Moody's employment arrangement with Coliseum (particularly the contractual terms setting forth Med-Source's relationship with AAS and Coliseum's lack of control and supervision over the details of Moody's work), her length of service does not cut strongly in her favor.

### 5.    How was Moody paid?

As to the fifth factor, Moody was paid based on the number of hours a week she worked, not on a per-job basis as is typically the case with those individuals that the common law has traditionally considered independent contractors.  What strikes the Court as particularly important with respect to this factor, however, is not necessarily the manner in which Moody's pay was calculated, but rather the *source* of her income:  Moody received her paychecks from Med-Source, not Coliseum. (Moody Dep., doc. 35, at 8:4-5).  In fact, the contract pursuant to which Moody was assigned obligated Med-Source to "compensate all employees provided [to AAS] in

accordance with the requirements of applicable federal, state, and/or local regulations." (Ex. B to Def.'s Mot. Summ. J, doc. 24, at 10).  Further, Med-Source has the "sole and exclusive responsibility for the payment of wages to personnel for services performed by them at [Coliseum]." (*Id.* at 13).  The fact that Med-Source, rather than Coliseum, compensated Moody for her services strongly suggests that she performed her work at Coliseum as an independent contractor and not an employee.

### 6.   *How was the work relationship terminated?*

The working arrangement between Moody and Coliseum was effectively terminated at Coliseum's insistence when Coliseum placed Moody on its "do not use" list.  Moody received notice from Monica Pope, through AAS, that she had been placed on the list for work-related problems, including missing too many shifts and not being willing to take other positions.  Notably, however, Coliseum's decision to put Moody on its "do not use" list did nothing to interfere with or disrupt Moody's employment with Med-Source.  As she testified in her deposition, Moody remained an employee of Med-Source following her placement on the list and continued to be assigned to various medical facilities for the purpose of performing LPN-related services.  The important thing to bear in mind with respect to this factor is that the working arrangement between Moody and Coliseum was essentially terminable at the will of either party—Coliseum was free to place any agency-provided personnel,

including Moody, on its "do not use" list, while Moody and other agency personnel remained free to decline assignments to Coliseum at any time and for any reason, regardless of how regularly such assignments had been accepted in the past. (Moody Dep., doc. 35, at 45:19-21).

>    *7.    Did Coliseum afford Moody annual leave?*

There is no evidence to suggest that Coliseum provided Moody annual leave.

>    *8.    Were Moody's services an integral part of Coliseum's business?*

The Court will assume that Moody's work as an LPN at Coliseum can be considered "an integral part of" Coliseum's business of providing medical services to patients admitted for treatment.  Yet again, this fact is of only marginal relevance, if any, and does little to help Moody given the other circumstances surrounding her working arrangement with Coliseum.

>    *9.    Did Coliseum provide Moody retirement benefits?*

Moody did not participate in, and there is no evidence that she was afforded the opportunity to participate in, a retirement benefit plan provided by Coliseum.  (*Id.* at 41:8-10).

>    *10.    Did Coliseum pay Moody's social security taxes?*

Coliseum did not pay social security taxes on behalf of Moody during the time that Moody provided nursing services to the hospital.  That obligation instead fell

squarely on Med-Source under its contract with AAS: "[Med-Source] shall with respect to said personnel [i.e. Moody] . . . pay federal social security taxes." (Ex. B to Def.'s Mot. Summ. J., doc. 24, at 10).

> 11. *What were Med-Source's and AAS's intentions with regard to Moody's employment arrangement with Coliseum?*

Finally, with respect to the intention of the parties, it is more than clear from the contractual provisions discussed above that both Med-Source and AAS (and therefore Coliseum) expected that Med-Source's employees would be treated as independent contractors of the medical facilities to which they were assigned. That expectation is plainly reflected in the terms of the contract (generally the best evidence of intent) between Med-Source and AAS, under which Med-Source is to be considered the independent contractor of AAS (and by extension the independent contractor of Coliseum) and Med-Source's personnel are to be considered Med-Source's employees only. (*Id.* at 13) ("[Med-Source] is performing services and duties required hereunder as an independent contractor and not as an employee [of] . . . [AAS]. All personnel assigned to [AAS] pursuant to this agreement shall . . . be considered employees of [Med-Source] only.").

As noted above, the most important objective in analyzing the facts and circumstances surrounding an employment relationship in a case like this one is to

determine whether the employer in question has the "right to control the 'means and manner' of the worker's performance." *Cobb*, 673 F.2d at 340.  The Court has kept this objective in mind in applying the *Cobb* factors to the working arrangement between Coliseum and Moody.  Despite considerable evidence to the contrary, Moody maintains that Coliseum exercised sufficient control over the "nursing aspects" of her job to render her an employee of Coliseum under Title VII simply because she "underwent training as to Coliseum's policies and practices just as any other employee of Coliseum."  Pl.'s Opp'n Def.'s Mot. Summ. J., doc 28, at 8.  Moody may have undergone training that was, in some respects, "just as any other employee of Coliseum."  But, standing alone, the fact that Moody was required to abide by Coliseum's "policies and practices" says nothing of its right to control the specific means and manner of her day-to-day nursing tasks.  The Court again notes that the "right to control" indicative of an employer/employee relationship is "not only as to the result to be achieved, but also as to the details by which that result is achieved." *Cobb*, 673 F.2d at 340.  Moody has not produced evidence to demonstrate the requisite degree of control.

Based on the evidence before the Court, no reasonable juror could conclude that Moody was an employee of Coliseum.  Accordingly, Moody has failed to create a genuine issue of material fact on either of her Title VII claims, and Coliseum is

entitled to judgment as a matter of law on both of them.[6]

## IV.  CONCLUSION

For the foregoing reasons, Moody's motion to exclude (doc. 29) is hereby **DENIED**, and Coliseum's motion for summary judgment (doc. 24) is hereby **GRANTED**.


SO ORDERED, this 12th day of June, 2006.


<u>**/s/ Duross Fitzpatrick**</u>
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/sew

---

[6] Because Moody was not an employee of Coliseum, the Court does not address the remaining merits of her hostile-environment and retaliation claims.